<p style="text-align:center;color:red;">**Corrected**</p>

# In the United States Court of Federal Claims

<p style="text-align:center;">No. 15-1301<br/>Filed: February 28, 2022</p>

---

**PHILLIPS & JORDAN, INC.,**

     *Plaintiff,*

**v.**

**THE UNITED STATES,**

     *Defendant.*

---

*James W. Copeland*, Copeland Law Firm, LLC, Atlanta, Georgia, for Plaintiff.

*Jimmy S. McBirney*, *Ashley Akers*, Trial Attorneys, *Claudia Burke*, Assistant Director, *Patricia M. McCarthy*, Commercial Litigation Branch, *Brian M. Boynton*, Acting Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, D.C., *Amber Jackson*, U.S. Army Corps of Engineers, for Defendant.

## POST-TRIAL OPINION AND ORDER

**TAPP, Judge.**

  This South Florida construction contract case involves two differing site condition claims and a subcontractor's entitlement to damages. Although Phillips & Jordan, Inc. brings this action, the real party in interest is its subcontractor, Optimum Services, Inc. ("OSI").[1] At trial, though OSI attempted to prove a differing site condition with respect to the soil content, OSI failed to establish several elements of that claim, principally whether the contract represented that the contractor would encounter a particular percentage of shell content. OSI also attempted to prove that it remains undercompensated for a differing site condition the United States previously acknowledged. However, OSI failed to establish uncompensated liability. Even if it had, OSI's method of calculating damages is overly speculative.

### I. Background

  On July 14, 2011, the United States Army Corps of Engineers ("Army Corps") awarded Phillips & Jordan, Inc. a $32.4 million contract to construct the first phase of the C-44

---

[1] Because this is a subrogated claim, the Court often uses "Plaintiff" where the distinction is immaterial and the respective companies' names where more clarity is necessary.

Reservoir/Stormwater Treatment Area Project in Martin County, Florida. (Joint Stipulations of Fact ("JSOF") at ¶ 2, ECF No. 87; PX014.005, .213; PX016).



**VICINITY MAP**

*Phillips & Jordan, Inc. v. United States, 15-1301 Trial Exhibit: PX015.002*

Several months later, Phillips & Jordan subcontracted intake canal excavation, embankment, and demolition work to OSI. That subcontract was worth $5,515,769.86. (JSOF at ¶ 3). Excavation and embankment were part of the prime contract, contract line-item number ("CLIN") 0005. (PX014.007).

Approximately a year and a half later, the Army Corps revised the scope of its contract with Phillips & Jordan to address shortages of material in the intake canal and requested that Phillips & Jordan revise its pricing to accommodate those revisions to CLIN 0005. (JSOF at ¶ 4). Accordingly, Phillips & Jordan submitted a Request for Equitable Adjustment ("REA") totaling $5,461,937.87—most of which ($4,784,584.79) would be passed through to OSI. (*Id.* at ¶ 5).

Just a few days later, Phillips & Jordan submitted a second response to the Army Corps' scope revision, separate and distinct from its first REA, requesting an additional $4,961,623.29 for "Total Additional Cost[s] Due to Defective Spec[ifications]: Intake Canal Material Shortage." (*Id.* at ¶ 6). That second proposed scope revision would be largely passed through to OSI after Phillips & Jordan retained roughly $700,000 for its overhead and profit markup. (*Id.*).

In January 2014, the Army Corps and Phillips & Jordan bilaterally executed Contract Modification P00022, increasing the total contract price by $4,857,756.55 and extending the project completion date by 114 calendar days in response to, and as a final resolution of, Phillips & Jordan's second response to the revised contract scope. (*Id.* at ¶ 7). Contract Modification P00022 stated that the contract price increase and time extension "reflects all credits due the Government and all debits due the Contractor," and that the adjustment "constitutes

compensation in full on behalf of the Contractor and its Subcontractors and Suppliers for all costs and markups directly or indirectly attributable for the change ordered, for all delays related thereto, for all extended overhead costs, and for performance of the change within the time frame stated[.]" (*Id*.; PX243). Contract Modification P00022 caveated that it did "not include costs associated with the contractor's pending REA, submitted under Serial Letter H-0076, [Phillips & Jordan's first REA response]." (JSOF at ¶ 7; PX243).

In June 2014, Phillips & Jordan converted its first REA into a pass-through certified claim from OSI to the Army Corps. (JSOF at ¶ 8). That certified claim sought $4,784,584.79 in compensation to be passed through to OSI and $21,577.88 in bonding costs to Phillips & Jordan. (*Id*.). That pass-through claim amount, $4,784,584.79, matches exactly the amount OSI sought to receive through Phillips & Jordan's first REA. (*See id*. at ¶ 5). On July 25, 2013, the Army Corps accepted Phillips & Jordan's performance as complete. (*Id*. at ¶ 9). Several months later, the Army Corps denied Phillips & Jordan's certified claim. (*Id*. at ¶ 10).

Two years later, in October 2016, Phillips & Jordan revised, certified, and submitted its claim to include OSI's certified modified total costs calculations, that time seeking $4,653,512.68. (*Id*. at ¶ 11). If the Army Corps approved that certified claim, Phillips & Jordan intended to pass through $4,066,298.51 to OSI. (JSOF at ¶ 11). Phillips & Jordan now asks the Court to review the Army Corps' original denial of Phillips & Jordan's certified claim, as amended in October 2016. (*Id*. at ¶ 12).

Plaintiff's four-count Complaint primarily raises two issues. First, Plaintiff contends that the soils it encountered on the site differed from the soils that the contract specified Plaintiff would encounter. (2d Am. Compl. at ¶¶ 34–50, ECF No. 32). Plaintiff seeks damages for that difference, and couches that claim as a differing site condition, or alternatively, a defective specification. (*Id*.). Second, Plaintiff asserted that there was a material imbalance between excavation and embankment material quantities. (*Id*. at ¶¶ 14–33). In other words, the quantity of soil Plaintiff was required to excavate from the canal was insufficient to construct the embankment to the contract's specifications. Plaintiff asserts entitlement to damages related to the imbalance, which Plaintiff characterizes as due to a differing site condition, or alternatively, a defective specification.[2] (*Id*.).

Beginning August 16, 2021, the Court conducted a seven-day trial on these issues in West Palm Beach, Florida. During trial, the Court heard testimony from nine witnesses, including Daniel Eastman (the President of OSI), two former vice presidents of Phillips & Jordan, three Army Corps employees, an employee from OSI, and two expert witnesses.[3] At the conclusion of the trial, on August 24, the parties agreed to simultaneously submit post-trial briefs

---

[2] Plaintiff's defective specification claims are based on an alleged breach of implied warranty of adequate design.

[3] A transcript of the trial is docketed at ECF Nos. 123–29. The Court will reference the witness's name in trial citations to reflect their time on the stand (*e.g.*, "(Eastman, TR at 164)"), but quotations may reflect questions or statements of counsel where appropriate. Discussions between attorneys and the Court will be noted as a "Colloquy."

"not later than close of business 40 days following the production of the [trial] transcript." (Colloquy, TR at 1273:20–22).

After some unexpected delay, the transcript was filed in the Court's CM/ECF filing system on September 27, 2021. Shortly thereafter, citing the unexpected delay, as well as personal and professional conflicts, the United States requested an enlargement of the deadline to file post-trial briefs from November 8 to November 29. (ECF No. 131). The Court granted that extension over Plaintiff's objections. (Oct. 5, 2021 docket Order). Before noon on November 29, Plaintiff requested a "48-hour enlargement" of the deadline to December 1, 2021, stating Plaintiff's counsel needed only "48 more hours, to tie up loose ends, finish filling in pinpoint citations and cross references, and proofread and check the stated figures." (ECF No. 132). The Court granted that extension, ordering that post-trial briefs "shall be filed no later than 12/1/2021 at 4:00 PM (ET)." (Nov. 29, 2021 docket Order). Plaintiff failed to comply with that Order, filing its brief after the 4:00 PM deadline. Plaintiff then requested an enlargement, stating that "Plaintiff's counsel was not aware of the 4 PM deadline" and only became aware after counsel for the United States reminded him after the deadline had passed. (Mot. for Enlargement of Time, ECF No. 135). The Court grants Plaintiff's motion. After allowing more than 90 days for post-trial briefing, this case is now ripe for decision. (*See* Def.'s Post-Trial Brief, ECF No. 133; Pl.'s Post-Trial Brief, ECF No. 134).

## II.     Findings of Fact

In 2011, the Army Corps issued Solicitation No. W912EP-11-R-0008—a request for proposals for the C-44 Reservoir Project ("the Project"). (PX014 (Solicitation and specifications)). The solicitation required excavation of the intake canal and embankment filling under CLIN 0005AA and 0005AB, respectively. (PX014.007). The specifications stated that "the Intake Canal may be excavated without dewatering[,]" but if the contractor chose to dewater, the surface of the water in the excavated portion could not extend below an elevation of 12 feet. (PX014.442). In placing embankment fill, the specifications demanded that the moisture content of the fill be limited and uniform. (PX014.443). The solicitation advised that excavated material might need to be reworked, and material that was too wet "shall be spread on the embankment or borrow area and permitted to dry, assisted by disking or harrowing, if necessary," until the moisture content requirements were achieved. (*Id*.).

Plaintiff's first set of claims depends on the content of the soil OSI encountered on the project site. Plaintiff asserts the soil OSI encountered differed from what the Army Corps represented in contract specifications, increasing OSI's performance costs and entitling it to damages. Plaintiff's second set of claims depends on an imbalance between the quantity of material OSI excavated from the canal and the quantity of material necessary to build the embankment. Plaintiff asserts that the imbalance led to increased equipment and labor costs for which the Army Corps has not fully compensated OSI. Although somewhat interrelated, the Court addresses these issues in turn.

### A.   Soil Content at the Project Site

One of the primary questions in this case is whether the soil Plaintiff encountered differed from the soil it expected to encounter based on a reasonable interpretation of the contract. That

4

is, whether the absence of "shelly sand" on the project site was a differing site condition. Plaintiff alleges they had expected to encounter what it characterized as "shelly sand," or sand with 30-40% shell by weight, which would drain more efficiently than the soils they encountered. But "shelly sand" is not a term of art defined in the contract. The solicitation identified and generally described two types of soil contractors might encounter on the project site. "Type 1" soils:

> [A]re encountered at or near the existing ground surface and typically extend to depths of 12 feet below ground surface. They are commonly light to dark brown, or tan in color. These soils shall be used as compacted fill for embankments, access roads, backfill around structures, and other general fill areas.

(PX014.438). "Type 2" soils:

> [C]onsist of tan, light grey or gray shelly sand material. Soil Type 2 material is typically encountered beneath the Soil Type 1 strata where the subsurface profile is undisturbed. Soil Type 2 material may be used within fill areas provided the Type 2 soils are a minimum of 3 feet from finished grade.

(*Id*.). The solicitation provided that the contractor may use Type 1 and Type 2 soils from canal excavation as fill in the embankment provided those soils otherwise met the contract specifications, including moisture content. (PX014.439). The solicitation also provided an additional detailed description of the content of those soils.

> Soil Type 1:

> > Soil Type 1 soils used as fill shall consist of soils classified as SM, SC, SPSM, or SP-SC in accordance with ASTM D 2487, or as approved by the Contracting Officer. These soils are generally light to dark brown, tan, or rust in color.

> > Soil Type 1 soils shall have fines content (i.e., percent passing the U.S. No. 200 mesh sieve – ASTM D 1140) of seven percent or greater. If localized deposits of borrow soils having less than seven percent fines are encountered, they may be homogenously blended with other borrow soils to obtain a mixture having greater than seven percent fines and subsequently used as fill.

> > Soil Type 1 soils shall have an organics content (ASTM D 2974) less than two percent, with no roots greater than ½ inch in diameter and longer than 12 IN.

> > Soil Type 1 soils used as fill shall be free from trash, clods and rock pieces greater than 3 inches in maximum dimension.

> Soil Type 2:

Soil Type 2 shall consist of shelly sand material, which is typically encountered beneath the Soil Type 1 strata where the subsurface profile is undisturbed.

Soil Type 2 soils used as fill shall consist of soils classified as SP, SP-SM, and SM in accordance with ASTM D 2487, or as approved by the Contracting Officer. These soils are generally tan, light gray or gray in color.

Soil Type 2 soils shall have an organics content (ASTM D 2974) less than two percent, with no roots greater than ½ inch in diameter and longer than 12 IN.

Soil Type 2 soils used as fill shall be free from trash, clods and rock pieces greater than 3 inches in maximum dimension.

(PX014.440–41). These hyper-technical definitions reference the American Society for Testing and Materials D2487 Unified Soil Classification System in explaining fines and organics content in soil. (*See* PX033 (ASTM D2487-06E1 provided a "system for classifying mineral and organo-mineral soils for engineering purposes[.]")):



*Phillips & Jordan, Inc. v. United States, 15-1301 Trial Exhibit: PX033.002*

ASTM also provides that the group names and symbols may be used to describe other materials, such as shale, claystone, shells, etc. (PX033.009). That information may also be included in the description. However, the soil classification system still applies based on particle size and plasticity characteristics. (*Id*.). For example, the classification system provides that material with 65% broken shells, 31% sand, and 4% fines would be classified as "Poorly Graded Gravel with Sand (GP)." The prefixes and suffixes of the abbreviated soil classification symbols do not include "with shell" or "shelly." (PX033.011). Thus while "shell" can be used to describe the nature of the material, describing soil as "shelly" does not inform the particle content or the classification of the soil.

The solicitation spells out exactly what is considered to be Type 2 soil according to its ASTM classification: "Soil Type 2 soils used as fill shall consist of soils classified as SP, SP-SM, and SM in accordance with ASTM D 2487, or as approved by the Contracting Officer." (PX014.440–41). "SP" refers to "poorly graded sand," "SM" refers to "silty sand," and "SP-SM" refers to "poorly graded sand" with some silt content. (PX033). Each of those classifications refers to a specific range of "fines" within the material, referenced in the fourth column from the left. (*Id*.). The fines and particle content of soil determines the degree to which the soil drains or holds moisture, and the effort required to achieve compaction of the embankment to the contract specifications. (Eastman, TR at 235:20–236:7, 409:14–18; Riley, TR at 969:23–970:24; Orr, TR at 509:12–24). "Shelly sand" is not a term defined by either the ASTM or the contract specifications.

Moreover, the Army Corps provided detailed information about the soil content at and around the project site. In 2005 and 2006, the Army Corps conducted seventeen soil borings along the canal. (PX015).[4] Drawing No. C1001 identifies the locations where the Army Corps took each of the borings. (PX015.039). Other related drawings include a summary of the soil analysis performed on the seventeen borings.[5] (PX015.040–42 (Drawing Nos. C1002, C1003, & C1004)). Those drawings, including the summarized soil analysis, were included as part of the solicitation and the contract. (PX014.176).

The Army Corps also created a site characterization report with more detailed soil analysis for the three borings drilled in 2005. (PX002). The solicitation and contract referenced a second site characterization report—the "C-44 Geotechnical and Geologic Site Characterization Report (posted as a separate document)" as "available for inspection[.]" (PX014.213 (the "Final Site Characterization Report")). That Final Site Characterization Report contained all the information from the 2005 borings report (PX002) plus aggregated data from the fourteen borings taken in 2006. (PX007 (Final Site Characterization Report)). The Final Site Characterization Report generally characterized the subsurface soil content. (PX007.197–200). Generally, it stated that there were three informal units of soil leveled under the project site. (*Id*.). "Unit A" material was described as "predominantly brown to gray sand and silty sand[.]" (PX007.197). Just below that, "Unit B" material was described as "predominantly gray clayey

---

[4] Although PX015 is marked as "PX 14," the parties referenced and introduced this document as Plaintiff's Exhibit 15. (Colloquy, TR at 174:11–22).

[5] The summaries contained in the drawings are known as "stick logs."

sand[.]" (*Id*.). And just below that, "Unit C" was described as "largely a mixture of gray fine sand and/or silty sand with variable shell content, with some intervals being mostly shell, and with some cemented fragments and limestone." (*Id*.). The Final Site Characterization Report went on to emphasize that the concentration of shell varied by location and cited to the boring logs for further information. (PX007.198). The Final Site Characterization Report was referenced as a part of the specifications in the solicitation and contract. (PX014.213). In summary, the drawings and summaries, as well as detailed data from all seventeen borings, were either included or referenced as part of the contract specifications. (*See* PX207). None used the colloquial "shelly sand." (*See also* PX15.040).

Daniel Eastman, the President of OSI, reviewed the drawings while preparing OSI's prime bid for the contract. (Eastman, TR at 347:7–349:5). Prior to bidding, Mr. Eastman understood the drawings as demonstrating that seventeen soil borings were taken along the project site. (*Id*. at 348:17–349:5, 352:16–22). Mr. Eastman does not recall requesting the detailed boring logs from the bores referenced in the drawings prior to bidding, despite knowing those logs were available. (*Id*. at 355:5–15).

### B.   *Prime and Subcontract Bids for Excavation and Embankment*

Phillips & Jordan prevailed over thirteen other bidders to receive the Army Corps' $32.4 million prime contract for the project. (PX276). OSI also submitted a bid for the prime contract. (PX276.006). In preparing its prime contract bid, Phillips & Jordan had planned to self-perform the excavation and embankment work in CLIN 0005. (DX007). Phillips & Jordan's prime bid for CLIN 0005 contemplated performing excavation at $2.00 per cubic yard and embankment at $1.80 per cubic yard—totals of $4,456,000 and $3,544,200 respectively. (PX276.003). OSI's prime bid for CLIN 0005 contemplated performing excavation at $2.50 per cubic yard and embankment at $1.57 per cubic yard—totals of $5,570,000 and $3,091,330 respectively. (PX276.005).

The United States' expert, Stephen Weathers, analyzed the fourteen prime bids contractors submitted for excavation and embankment.[6] (Weathers, TR at 1066:9–1067:8). The average bid for CLIN 0005 contemplated $4.41 per cubic yard for excavation and $2.68 per cubic yard for embankment. (*Id*. at 1067:14–1068:19). Mr. Weathers credibly concluded that, in comparing the average bid to OSI's bid, OSI's prime bid was "unreasonably low[.]" (*Id*. at 1068:15–19).

After Phillips & Jordan was awarded the prime contract, it solicited bids to subcontract, among other things, the excavation and embankment work in CLIN 0005. (*See* PX038; DX002). OSI bid to perform CLIN 0005 under a subcontract with Phillips & Jordan, contemplating

---

[6] Mr. Weathers is a licensed Professional Engineer. (Weathers, TR at 1033:9–25). As a civilian in the United States Navy, he administered and managed construction contracts before his consulting career. (*Id*. at 1031:15–1033:8). He has extensive experience analyzing modified total cost claims and has testified as an expert witness ten times. (*Id*. at 1034:10–24). The Court certified Mr. Weathers as an expert in construction damages including modified total cost analysis. (*Id*. at 1035:15–18, 1055:25–1056:25).

performing excavation at $1.86 per cubic yard and embankment at $0.56 per cubic yard. (PX038.016). OSI's subcontract proposal was dramatically and unreasonably lower than its prime contract bid for the same scope of work. (Compare PX276.005 ($2.50 for excavation and $1.57 for embankment) *with* PX038.016 ($1.86 for excavation and $0.56 for embankment)). Phillips & Jordan accepted OSI's subcontract bid, resulting "in a significant buy-out savings" to Phillips & Jordan because it had contracted with the Army Corps to perform this work at a higher cost per cubic yard. (DX007). OSI's subcontract bid was also conspicuously lower than other subcontract cost proposals. For example, Devland Site, Inc., an experienced construction firm, offered to perform the subcontracted work at $3.00 per cubic yard of excavation and $3.25 per cubic yard of embankment. (DX002.002). Chandler Construction and Development Inc. offered to perform the subcontracted work at $1.94 per cubic yard of excavation and $1.92 per cubic yard of embankment. (DX002.006).

One explanation for OSI's significantly discounted cost proposals is the assumptions OSI made with respect to the content of the soil it expected to encounter. For example, despite the project specifications requiring excavation "in the wet"—i.e., excavation of soil that was saturated with water—OSI's proposals contemplated only needing to handle material once, failing to anticipate that any drying would be necessary. (Eastman, TR at 408:18–24, 409:10–13). However, the soil OSI excavated held excessive moisture so, using heavy equipment, OSI spread the soil and aerated it by using a disk, thereby reducing the moisture content. (*Id*. at 247:11–248:13). If the soil had not contained excessive moisture, OSI could have loaded it directly after excavation into dump trucks and then compacted it with a bulldozer at its final destination. (*Id*.). Put differently, because of the high moisture content, OSI had to handle the soil twice—once during excavation from the canal to where it was spread to dry, then a second time to its final destination on the embankment. (*Id*. at 410:8–411:9). This double action greatly increased OSI's actual costs relative to its expected costs. (*Id*. at 248:11–13).

OSI was aware that the contract specifications contemplated that disking might be necessary to achieve the required moisture content. (*Id*. at 411:12–414:8; *see also* PX014.443). However, Mr. Eastman characterized that part of the specifications as "boilerplate." (Eastman, TR at 411:12–414:8). Based on Mr. Eastman's mistaken understanding and expectations regarding the content of the soil OSI would encounter, he did not expect disking to be necessary to achieve the required moisture content. (*Id*.). In contrast, at least one other bidder contemplated the need to handle the material twice. Ceres Environmental Services, Inc. ("Ceres"), a competitor of OSI and Phillips & Jordan, emailed Phillips & Jordan after Ceres's prime contractor bid debriefing regarding the discrepancy between the two companies' costs proposals in CLIN 0005. (DX012; Orr, TR at 525:1–530:17).[7] Ceres noted that its bid and Phillips & Jordan's were nearly identical, except with respect to CLIN 0005, for which Ceres bid higher on the expectation that Ceres would have to handle the material twice to disk and dry it. (Orr, TR at 525:18–527:19). Phillips & Jordan characterized this as "useful info," but discounted it due to other assumptions Ceres had made about dewatering before excavation and the fact that Ceres was a competitor.

---

[7] DX012 was only partially admitted. Mr. Weathers' resume and emails from Ceres to Phillips & Jordan, forwarded internally, were both admitted. (*See* Colloquy, TR at 1033:11-15, 524:20-23).

(*Id*. at 525:1–530:17). Ceres's prime bid—$4.70 for excavation and $3.15 for embankment—was higher than the average bid. (PX276.001).

OSI's expectations and assumptions regarding its bid pricing were almost solely based on its interpretation of the term "shelly sand" mentioned in the contract specifications, but not within the bore sample reports or the Unified Soil Classification System referenced in the specifications. (Eastman, TR at 341:20–343:3). OSI expected, based on its own interpretation of the contract specifications, that it would encounter sand with 30–40% shell content by weight. (*Id*. at 342:5–17). OSI's assumptions and interpretation of the non-specific term "shelly sand" were informed by Mr. Eastman's experience with a separate project in the same general geographical area—a private project known as "B-Lake"—completed several years before the C-44 Reservoir project began. (*Id*. at 406:18–407:6). Notably, the B-Lake project differed in several respects; chiefly, it involved excavating wet material and creating a soil material stockpile after some dewatering. (*Id*. at 407:7–408:10). The objective was to deepen a lake and preserve the excavated material for use on other projects. (*Id*. at 181:13–183:4). OSI characterized the material it excavated for the B-Lake project as "shelly sand," though it is unclear whether OSI or any other party performed soil analysis for B-Lake. (*Id*. at 181:10–182:2). As the United States was not involved in the B-Lake project, it did not characterize the soil for that project as "shelly sand" or otherwise. The B-Lake project did not involve construction of an embankment or moisture control specifications for the excavated material. (*See* Eastman, TR at 195:1–5 ("[I]t's a stockpile, which means it doesn't get compacted. [There's] no quality control, no densities [requirement], nothing like that. [The soil is] just pushed into a pile.")). OSI performed excavation on the B-Lake project at $0.50 per cubic yard. (PX028). OSI also performed loading, hauling, and stockpiling at $1.95 per cubic yard. (PX027; Eastman, TR at 194:9–195:5). OSI performed the B-Lake project on a $3.3 million contract, grossing nearly $900,000 in profit. (Eastman, TR at 200:40–20). OSI's successful performance on the B-Lake project just a few miles away influenced its analysis of the C-44 Reservoir Project insofar as OSI expected that the material would be similar.

### *C. Material Imbalance*

Plaintiff's second set of claims depends on its assertion that it was undercompensated for a material fill imbalance differing site condition. Approximately nine months after retaining OSI on the subcontract, Phillips & Jordan notified the Army Corps of an alleged differing site condition and defective specification due to "a shortage of fill material generated from the Intake Canal Excavation[.]" (PX127). The Army Corps investigated Phillips & Jordan's claim and confirmed the material imbalance. (PX323). In January 2014, the Army Corps issued a Price Negotiation Memorandum confirming the imbalance and entered a negotiated settlement with Phillips & Jordan, extending the time for performance by 114 days and compensating Phillips & Jordan. (PX323.002). The Price Negotiation Memorandum acknowledged that after over a year and a half of protracted negotiations, costs of overhead and out of sequence work had compounded. (*Id*.). However, the settlement addressed "all known cost elements associated with [the material imbalance] except for alleged costs incurred by the contractor prior to the Government recognizing the issue and Requesting a Proposal for the Changed Work." (*Id*.). The Army Corps had previously, in September 2012, acknowledged the issue. (PX323.005). The Army Corps memorandum reflected that another REA remained pending on that matter. (PX323.002).

On January 27, 2014, the Army Corps and Phillips & Jordan (represented by Lin Riley) executed Contract Modification P00022, increasing the contract amount by $4,857,756.55. (PX243.002). Some of the compensation from Contract Modification P00022 was passed through Phillips & Jordan to OSI as the subcontractor. (*Id*.). The parties understood that the adjustments to time and price reflected "all credits due the Government and all debits due [Phillips & Jordan]." (PX243.003). It constituted "compensation in full on behalf of the Contract and its Subcontractors and Suppliers for all costs and markups directly or indirectly attributable for the change ordered, for all delays related thereto, for all extended overhead costs, and for performance of the change within the time frame stated." (*Id*.). Again, the modification acknowledged that another REA (Serial Letter H-0076) remained pending, and the modification did not include costs associated with that REA. (*Id*.).

Serial Letter H-0076 forms the basis of Plaintiff's claims with respect to the allegedly uncompensated material imbalance. The origin of that letter relates to what the Court previously discussed as Phillips & Jordan's first REA in response to the Army Corps' contract scope modification, totaling $5,461,937.87—most of which would be passed through to OSI. (*See* JSOF ¶¶ 4–5). OSI submitted that REA to Phillips & Jordan (PX217) and, on June 17, 2014, Phillips & Jordan certified it as a pass-through claim and submitted it to the Army Corps. (PX219; PX248). Phillips & Jordan's certified claim sought $4,806,162.67 on behalf of OSI, alleging that the contract specified that canal excavation resulted in a shortfall of 700,000 cubic yards of material necessary to build the embankment. (PX252.001). Phillips & Jordan sought cost impacts OSI allegedly incurred due to increased haul distances and OSI's costs to stockpile and move Type 1 material "out of sequence," both compounded by the need to move more material than the contract specified. (*Id*.; PX217.006 *et seq*.).

One of the main issues underlying OSI's assertions in Phillips & Jordan's claim is OSI's allocation of "Type 1" and "Type 2" soils excavated from the canal. Type 1 soils were "encountered at or near the existing ground surface" and extended down approximately twelve feet. (PX014.438–439). Type 2 soils were typically encountered "beneath the Soil Type 1 strata[.]" (*Id*.). The contract specified that the contractor *may*, but was not required to, use both Type 1 and Type 2 soils to fill the embankment, so long as at least the top three feet of the embankment was Type 1 soil. (*Id*.). Therefore, importantly, the embankment could be constructed entirely of Type 1 soil according to the contract specifications. Alternatively, the contractor could utilize Type 2 soils for fill, then "cap" the top three feet of the embankment with Type 1 soils. OSI chose the latter option. (Eastman, TR at 273:5– 274:6). OSI began excavating the Type 2 soils adjacent to the embankment area, a haul distance of approximately 500 feet, while setting aside the Type 1 surface soil to use on the top three feet of the embankment. (*Id*. at 274:2–13). OSI started on the south end of the canal and worked in 1000-foot sections, moving north. (PX252.002).

However, OSI quickly ran out of Type 2 soil adjacent to the embankment area in-progress and began excavating sections further and further north to retrieve Type 2 soil to fill the embankment. (*Id*. at 274:14–275:8). Therefore, OSI's haul trucks had to travel ever-increasing distances (eventually up to 6000 feet) to place the excavated Type 2 material in the embankment. (*Id*.). Placing the Type 1 surface soil aside caused OSI to have to work out of sequence, increasing equipment costs while leaving more of the project area exposed to weather;

furthermore, the increased haul distances meant increased costs to maintain haul roads. (*Id*. at 275:13–276:8).

The Court understands OSI's strategy to have inadvertently created a (fatally flawed) excavation scheme requiring ever-further excavation of Type 2 soil. The acknowledged material shortage compounded OSI's predicament because, as each section of excavation yielded less material than necessary to complete the adjacent embankment, OSI was forced to incorporate more and more sections of excavation to complete a single section of embankment. The ultimate downfall of the strategy was accelerated by OSI's choice to set aside the Type 1 soil for use as the embankment cap, reducing the amount of embankment material OSI yielded in each section of excavation.

The Army Corps Contracting Officer denied Phillips & Jordan's pass-through claim in Serial Letter H-0076 on October 31, 2014. (PX252). The Contracting Officer reasoned that, since the embankment could have been constructed entirely of Type 1 material, a shortage of Type 2 material did not lend merit to a defective specification claim. (PX252.009). In other words, if the contractor was not required to use Type 2 material, there was no reason to mine Type 2 material increasingly further north and, therefore, OSI had no basis to claim cost impacts as a result of those self-imposed longer haul distances. (PX252.003, .009). The Contracting Officer also stated that OSI's claim—that because of the material shortage/imbalance there was not sufficient material to build the embankment to the required elevations—"was in fact a true statement and . . . was resolved via [M]odification P00022[.]" (PX252.009).

As it turns out, after receiving additional compensation under Modification P00022, Phillips & Jordan withheld from OSI part of the amount for which Phillips & Jordan billed the Army Corps for excavation and embankment under CLIN 0005. (Riley, TR at 946:23–950:8).[8] Despite OSI performing CLIN 0005 excavation and embankment work under a subcontract with Phillips & Jordan, Phillips & Jordan retained part of the Army Corps' compensation for that work resulting in an increase to Phillips & Jordan's profit margin on this contract. (*Id*. at 953:19–21). Furthermore, until OSI's retention of Lin Riley, a former Phillips & Jordan employee, as an expert witness, Mr. Riley's opinion was that Phillips & Jordan "was successful in securing additional funds to cover the cost for all of the issues which resulted in additional work and the extension of the project complete date." (*Id*. at 929:6–930:24; PX294.002). At trial, Mr. Riley attributed that prior opinion to a "mistake." (Riley, TR at 929:14–24).

### D. Changes to Claimed Damages

Plaintiff changed its damages theory before, during, and after trial. Plaintiff filed this action on November 2, 2015, originally seeking $4,806,162.67 in damages—an amount

---

[8] Lin Riley is a former Vice President of Phillips & Jordan and was the Project Executive for the C-44 Reservoir Project. (PX294). He was tendered by Plaintiff as both a fact and an expert witness, though at times the defining line between those two roles became unclear. The Court accepted Mr. Riley as an expert on several distinct issues and excluded him on others. (Colloquy, TR at 580:11–585:20).

consistent with Phillips & Jordan's certified claim. (*Compare* Compl., ECF No. 1 *with* PX252.001). With leave of Court, Plaintiff amended its complaint to seek $4,653,512.68 in damages instead. (2d Am. Compl. at 1). At trial, OSI no longer believed that amount to be accurate. (Eastman, TR at 396:18–25). Plaintiff's own expert regarding damages, Paul Britton, could not recall the number of times Plaintiff had changed its damages calculation. (Britton, TR at 74:7–22).[9] Mr. Britton was not involved in calculating the damages Plaintiff presented in its pre-trial brief which, again, differed from the previous calculations. (*Id*. at 75:16–76:2). Plaintiff's Pre-Trial Brief calculated damages as "*at least* $2,505,000" for Phillips & Jordan, for which it intended to pass "*at least* $2,188,901" through to OSI. (Pl.'s Pre-Trial Brief at 15, ECF No. 121 (emphasis in original)). To summarize, disregarding the multiple iterations in damages calculations prior to trial, Plaintiff posited at the beginning of trial that its damages were approximately $2.1 million less than when it filed its Amended Complaint and approximately $2.3 million less than the claim presented to the Army Corps.

At trial, Plaintiff's damages calculations shifted yet again (interestingly enough) during Plaintiff's cross-examination of the United States' damages expert. (Weathers, TR at 1238:13–1245:18). The damages calculation Plaintiff seemed to arrive at during trial was $2,720,174, exclusive of markups for Phillips & Jordan. (*Id*. at 1245:9–17). Finally, in its Post-Trial Brief, Plaintiff requested $2,461,977 for Phillips & Jordan. (Pl.'s Post-Trial Brief at 40). However, this amount purports to be the sum of OSI's alleged damages—$2,179,083—and Phillips & Jordan's "markups"—$314,456—but it is not. (*Id*.). That arithmetic is inexplicably erroneous, and therefore, Plaintiff's ultimate damages figure is erroneous.

Mr. Eastman, president of OSI, was unable to quantify OSI's damages at trial. (Eastman, TR at 417:14–420:2). Mr. Weathers, the United States' expert on damages, testified that in preparing his expert opinion that OSI's cost calculations were not reasonable, he had received "at least eight iterations to the claim . . . each with different flaws and oversights." (Weathers, TR at 1131:1–14). He also testified that he had not seen a damages model "that [was] based upon reasonable assumptions that are supported by the project record." (*Id*.). Mr. Weathers helpfully presented several different scenarios, using average bids for both the prime contract and the subcontract as benchmark "reasonable" bid prices.[10] His methodology essentially compared OSI's claim, as presented, to hypothetical scenarios in which OSI had submitted a "reasonable bid" in line with the average bidder. (*Id*. at 1248:8–1251:60). Mr. Weathers also used both Phillips and Jordan's and OSI's prime bids as a benchmark "reasonable bid." (*Id*. at 1250:9–20). Each of these iterations, comparing OSI's actual claim to its hypothetical claim had it submitted a reasonable bid, resulted in a negative damages number. (*Id*. at 1250:9–20, 1251:8–15, 1258:9–22, 1260:24–1261:11).

---

[9] Plaintiff tendered Mr. Britton as an expert on "the reasonableness of [OSI's] . . . subcontract estimate." (Colloquy, TR at 64:21–65:8).

[10] As described previously, the average prime bid for CLIN 0005 contemplated $4.41 per cubic yard for excavation and $2.68 per cubic yard for embankment. (Weathers, TR at 1067:14–1068:19).

### III.     Conclusions of Law

Before addressing the merits of OSI's claim, emphasis on the Court's rules is warranted. The briefing requirements of the Court are not onerous. Generally, RCFC 5.4 outlines the minimal requirements, i.e., "[a] brief or memorandum must be compact, concise, logically arranged, and free of burdensome, irrelevant, immaterial, and scandalous matter." The same rule generally requires inclusion of a table of contents, a table of cited legal authorities, a statement of the questions presented, a statement of the case, and a clear statement of the arguments. These nominal requirements promote the goals announced in RCFC 1: "to secure the just, and inexpensive determination of every action and proceeding."

Of equal import, briefing should inform the Court of the relevant issues, applicable law, and the facts or expert opinions deemed necessary to effectively enlighten and persuade the Court. While no brief (or court opinion for that matter) is without error, casual disregard or wholesale non-compliance with the rules places the authoring party at unnecessary risk. Often, minor errors are easily overlooked. A reviewing court can easily discern a party's arguments and the facts within the evidentiary record which support those arguments. But the significance of sufficient citation to the evidentiary record cannot be overstated. Failure to accurately cite to case law and the record invokes the oft-repeated adage: "[j]udges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). In rare cases, briefing deficiencies significantly impair the Court's role in conducting extensive consideration of the issues.

When confronted with briefing issues, a court may resort to one of three approaches. The first approach is by far the most common. A court may ignore the deficiency entirely. *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970) ("[I]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it."); *but see D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1152 (Fed. Cir. 1983) ("Strict compliance with local procedural rules is, of course, always desirable."). Given that most errors are minor and do not impair the Court's ability to identify issues and the portions of the record that either support or undercut proposed factual findings, this approach is normally the best, most efficient option. Chief among its attributes, by avoiding unnecessary delay, consideration of the merits with disregard for negligible briefing deficiencies speeds disposition of the issues. This is particularly true where the Court is sitting as a trier of fact and is somewhat dependent on its own recollection of trial events.

Alternatively, a court may refuse to accept a deficient brief, order the brief corrected, and defer consideration of the merits until the filing of a compliant brief. *Uniloc 2017 LLC v. Apple, Inc.*, 964 F.3d 1351, 1363 (Fed. Cir. 2020) ("A [trial] court does not abuse its discretion simply because it elects to strictly enforce its local procedural rules."). This option is also attractive: it reinforces the importance of compliance with the Court's rules, and when the deficiency can be quickly corrected (e.g., omission of a table of authorities), does not unnecessarily prolong consideration of the issues.

In extreme cases, a court may instead impose the harshest sanction, striking entirely the offending brief or dismissing the offending party's claim. RCFC 5.4(a)(1) ("The court may

14

disregard a brief or memorandum that fails to comply with this rule."); RCFC 41(b) ("If the plaintiff fails to prosecute or to comply with these rules or a court order, the court may dismiss [with prejudice] on its own motion[.]").

Here, Plaintiff's non-compliance with baseline rules and established norms are not of the normally-encountered de minimis variety.[11] Before accepting Plaintiff's memoranda as tendered, the Court considered each of the alternatives described above. Striking the deficient brief without leave to file an amended corrected brief would be entirely too severe especially given that the Court can still, despite the deficiencies, identify the thrust of the arguments. Striking the offending brief with leave to refile is also inappropriate. Post-trial briefing exceeded 90 days. And as the Court has noted previously, this litigation has been plagued by delay. Prior to the post-trial extensions mentioned above, in six years of litigation, the Court has granted more than 20 extensions or enlargements of time at the parties' request. Given the types and numerosity of deficiencies that appear in the briefing, the Court has little confidence that anything short of an extended enlargement to permit the filing of a correct, adequately formatted, and supported brief would be sufficient. By accepting the brief, and addressing the merits of the claims, the Court again emphasizes the unnecessary risk attendant to disregard of the rules: even where a court accepts a deficient brief, presentation of a flawed or imperfect evidentiary record deprives the brief of much of its persuasive potential. *Cf. Bishop v. Smith*, 112 F. Supp. 3d 1231, 1247 (N.D. Okla. 2015) (recognizing that, when courts consider an attorney's entitlement to fees, "[a]ccurate numbering, citations" and organization are important components of a lawyer's brief, and when defects "lead[] a court astray, [it] sets a tone of carelessness" and impacts credibility.); *see also Alexander v. F.B.I.*, 186 F.R.D. 188, 191 (D.D.C. 1999) ("Attorneys do their own clients a disservice—by losing credibility with the court—when they fail to accurately represent facts and then base their legal arguments on these inaccuracies.").

Turning now to the merits, the Court notes that: "[a]lthough differing site conditions and defective specifications claims are distinct in theory, they collapse into a single claim under facts such as these, where the alleged defect in the specification is the failure to disclose the alleged

---

[11] The Court's rules require, among other things, a table of authorities, a statement of the questions presented, an argument which references the points of law and fact, and the authorities relied upon. RCFC 5.4(a)(2). In this instance, Plaintiff's Post-Trial Brief Table of Authorities consists of seven case citations, each supposedly appearing on the first page of the memorandum when none of those cases appear on page one. Citations to the cases and other authorities appearing in the remaining 39 pages of the memorandum are completely absent from the Table of Authorities. Of the case citations which do appear within the text of the memorandum, eight lack completed citations. (*See e.g.*, Pl.'s Post-Trial Brief at 33 ("*Ace*, 70 Fed. Cl. at ___ citing ?")). The brief omits over 100 record cites (*see, e.g.*, Pl.'s Post-Trial Brief at 4 n.17 ("Orr, __, tr. __; Riley __, tr. __.")). This deficiency challenges the Court to create a sufficient evidentiary record to support the arguments presented. Again, that is not the Court's role. Moreover, though the underlying claims involve significant sums which would be paid by taxpayers, Plaintiff's brief contains multiple erroneous mathematical calculations, though admittedly some are merely transpositional. (*See, e.g.*, Pl.'s Post-Trial Brief at 26 (¶ 104 erroneously asserting that $12,118,896 minus $9,915,898 equals $2,203,088), 28 (¶ 109 erroneously asserting that $12,118,896 minus $9,939,903 equals $2,179,083)).

differing site condition." *Comtrol, Inc. v. United States*, 294 F.3d 1357, 1362 (Fed. Cir. 2002). Here, the facts of Plaintiff's claims are so intertwined that the Court looks to the differing site conditions clause of the contract and the case law under that clause. *See Meridian Eng'g Co. v. United States*, 885 F.3d 1351, 1361 (Fed. Cir. 2018).

A contractor bringing a differing site condition claim must prove, by a preponderance of the evidence, four elements. *Renda Marine, Inc. v. United States*, 509 F.3d 1372, 1376 (Fed. Cir. 2007) ("The contractor must then prove by a preponderance of the evidence that the conditions encountered during the contract performance differed materially from the conditions indicated in the contract"). First, the plaintiff "must prove that a reasonable contractor reading the contract documents as a whole would interpret them as making a representation as to the site conditions." *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1348 (Fed. Cir. 2008). "Second, the contractor must prove that the actual site conditions were not reasonably foreseeable to the contractor, with the information available to the particular contractor outside the contract documents[.]" *Id*. at 1349. The second element is one of the contractor's "reasonable reliance" on its own interpretation of the contract terms. *Renda Marine, Inc.*, 509 F.3d at 1376 ("[T]he contractor must demonstrate that the conditions encountered were not reasonably foreseeable in light of all information available to the contractor when bidding, that the contractor reasonably relied upon its original interpretation of the contract[.]"). "Third, the contractor must prove that the particular contractor in fact relied on the contract representation." *Winter*, 523 F.3d at 1349. "Fourth, the contractor must prove that the conditions differed materially from those represented and that the contractor suffered damages as a result[.]" *Id*. The first element involves a question of law; the remaining three elements involve questions of fact. *Id*.

    A.  *Plaintiff failed to demonstrate the presence of a differing site condition with respect to the soil content.*

Plaintiff contends that the contract specifications represented that, in performing wet excavation of the soil strata below an elevation of twelve feet, the contractor would encounter Type 2 soil. (Pl.'s Post-Trial Brief at 12). That is indisputably true. (PX014.438–39, .440–441). Plaintiff also argues that a reasonable person reading the contract documents would interpret the soil identified as "Type 2" to mean "shelly sand," defined as material with 50% sand and 30% shell by weight. (*Id*. at 13). The Court disagrees.

The contract specifications made very explicit representations as to the content of the soil material contractors could expect to encounter. While the specifications did use the word "shelly sand" to describe the soil generally, the specifications offered precise definitions of what it meant by "Type 2 Soil." That distinction is critical. The specification provided a definition that referenced the Unified Soil Classification System standards. (PX014.440–41). Despite Plaintiff's urging that the Unified Soil Classification System "has the effect" of defining shelly sand (Pl.'s Brief at 13), it does no such thing. As previously explained, the prefixes and suffixes of the abbreviated soil classification symbols do not include "with shell" or "shelly." (PX033.011). Thus while "shell" can be used to describe the nature of the material, describing soil as "shelly" does not inform the particle content or the classification of the soil and thus the term "shelly sand" has no technical definition under the referenced classification system.

Moreover, the contract explicitly defined Type 2 soil and its consistency. The specifications stated: "Type 2 soils used as fill shall consist of soils classified as SP, SP-SM, and SM in accordance with ASTM D 2487, or as approved by the Contracting Officer." (PX014.440–41). SP, SP-SM, and SM are specifications for soil material that precisely describe the particle and fines content that contractors could expect in the soil. (*Id.*; PX033.002). Even if "shelly sand" generally described the Type 2 soil content, the more specific definitions—SP, SP-SM, and SM—control. *See Hometown Financial, Inc. v. U.S.*, 409 F.3d 1360, 1369 (Fed. Cir. 2005) ("Our precedent establishes as a principle of contract interpretation that a specific contract provision will control over a general contract provision.").

Finally, and perhaps most convincingly, the contract specification provided *actual* soil analysis from which contractors could set their expectations for the project. (PX015; PX014.176; PX002; PX007). The Final Site Characterization Report, referenced as part of the project, did not provide a representation of shell content with respect to Type 2 material. (PX007). It simply stated that concentration of shell varied by location and directed contractors to examine the borings and the analysis of the soil. (PX007.197–198). Mr. Eastman reviewed the drawings that contained this information and understood where to find the detailed soil analysis but did not review that analysis prior to bidding. (Eastman, TR at 347:7–349:5, 348:17–349:5, 352:16–22, 355:5–15). Failure to do so is significant. Instead of relying on the soil analysis from the Project site, Mr. Eastman relied on his experience with the B-Lake project. (*Id.* at 406:18–407:6). As described above, that project was materially different from the C-44 Reservoir Project. Any reliance on the B-Lake project and the soil encountered there was objectively unreasonable given that the contract specifications included more relevant information and a detailed soil analysis. Plaintiff's assumption, that the site conditions for the C-44 Reservoir Project would be similar to B-Lake, was not the product of detailed comparative analysis, it was simply a miscalculation for which Plaintiff bears responsibility. *See Weeks Dredging & Contracting, Inc. v. United States*, 13 Cl. Ct. 193, 219 (1987), *aff'd*, 861 F.2d 728 (Fed. Cir. 1988) (while a miscalculation, "*i.e.,* the assumption of a perceived fact which proved erroneous[,] [is] unfortunate, nevertheless, it is a risk for which only the contractor must assume responsibility.").

Consequently, the Court concludes that Plaintiff cannot succeed on its differing site condition claim with respect to the soil content because it cannot prove either of the first two elements of such a claim. First, a reasonable contractor, looking at the contract specifications for Type 2 soil, would not read that specification as providing a representation that contractors could expect to encounter 30% shell content by weight. Second, Plaintiff cannot show reasonable reliance on its own interpretation of the contract specifications with respect to soil content. The actual soil analysis of the C-44 Reservoir Project site was included with the specifications. Plaintiff simply miscalculated by either discounting or ignoring the soil analysis contained or referenced in the contract in favor of its own unscientific perceptions developed through experience on another project. Any reliance on the conditions at B-Lake was unreasonable given the information Plaintiff had at its disposal. These first two elements are indispensable to a differing site condition claim; therefore, the Court need not examine the remaining elements. The United States is entitled to judgment on Plaintiff's Second Amended Complaint Counts III and IV.

*B. Plaintiff has failed to demonstrate entitlement to damages with respect to the material imbalance.*

Plaintiff also alleges a differing site condition and defective specification with respect to a material fill imbalance. (2d Am. Compl. at ¶¶ 14–33). The United States concedes the existence of a differing site condition with respect to that imbalance. (*See, e.g.*, Def.'s Post-Trial Brief at 16). However, the United States maintains that the imbalance was previously acknowledged by the Army Corps and Plaintiff was fully compensated for that imbalance in Contract Modification P00022. (*Id.*). Plaintiff urges that Modification P00022 provided incomplete relief for costs OSI incurred due to increased haul distances, out of sequence work, and other related activities. (Pl.'s Post-Trial Brief at 9–10). Although the United States has acknowledged the differing site condition, Plaintiff's claim must still fail because it does not demonstrate entitlement to additional compensation. *See Winter*, 523 F.3d at 1349 ("the contractor must prove that the conditions differed materially from those represented *and that the contractor suffered damages as a result*[.]") (emphasis added). Because Plaintiff cannot show additional damages, the United States is entitled to judgment.

Although the Court sympathizes with Plaintiff's plight with respect to the interrelated problems of a recognized material fill imbalance and the cost of increased haul distances, out of sequence work, and other costs, the Court has no basis to determine that the Army Corps bears responsibility for those expenses. Plaintiff chose a method of building the embankment that was certainly allowed but proved to be inefficient. (Eastman, TR at 273:5– 274:6, 274:2–13). The terms of the contract did not require Plaintiff to fill the embankment with any Type 2 material at all. (PX014.438–439). The only contractual requirement was that the top three feet of the embankment consist of Type 1 material. (*Id.*). The entire embankment could have been constructed with Type 1 material. Had Plaintiff constructed the embankment using all Type 1 material, it is speculative whether OSI would have run out of Type 1 material suitable for the embankment cap. Indeed, the material imbalance was the impetus for Contract Modification P00022. (PX252.009). However, Plaintiff's chosen method for recording costs makes it impossible for the Court to determine whether that modification offered complete compensation for the imbalance. It is equally uncertain whether Plaintiff would have needed to locate additional Type 1 material elsewhere, and whether costs associated with that pursuit would have been compensable as a differing site condition. After all, Phillips & Jordan failed to pass through to OSI some of the compensation the Army Corps paid it for CLIN 0005 work. (Riley, TR at 953:19–21).

But the plaintiff bears the burden of showing the differing site condition and resulting damages. *Renda Marine, Inc.*, 509 F.3d at 1376. The Court must be afforded a sufficient basis to find that, more likely than not, Plaintiff incurred costs for which Modification P00022 provided incomplete relief. *See id.*; *see also Cavalier Clothes, Inc. v. United States*, 51 Fed. Cl. 399, 424 (2001) (rejecting plaintiff's claim that included costs associated with a previous contract modification and observing that "it [was] impossible to quantify accurately the amount of costs" appropriately apportionable between the contract modification and the plaintiff's additional claim.); *cf. Willems Indus., Inc. v. United States,* 155 Ct. Cl. 360, 376 (1961) (a claimant pursuing damages for a breach of contract bears the burden to prove the fact and amount of loss "with sufficient certainty so that the determination . . . will be more than mere speculation"). When the plaintiff gives the Court "no sound reason for believing it has been undercompensated"

there is no basis to award damages. *WRB Corp. v. United States*, 183 Ct. Cl. 409 425 (1968). Plaintiff has failed to carry its burden here, and thus the Court directs judgment in favor of the United States on Plaintiff's Second Amended Complaint Counts I and II.

### C. *Plaintiff has failed to demonstrate entitlement to recovery under its damages theories.*

The fourth element of both a differing site condition and defective specification claim is proof of damages. *Winter*, 523 F.3d at 1348; *Comtrol, Inc.*, 294 F.3d at 1362 ("Where the differing site conditions claim and the defective specifications claim are so intertwined as to constitute a single claim, that claim will be governed by the specific differing site conditions clause and the cases under that clause."). Here, Plaintiff has chosen to pursue damages under the modified total cost theory.

A modified total cost claim is a disfavored theory of damages. *See H. John Homan Co. v. United States*, 418 F.2d 522, 528 (Fed. Cir. 1969) ("It is true that the total cost theory of proving damages in a contract case is not generally favored."). Under the modified total cost method, "the contractor must show: (1) the impracticability of proving actual losses directly; (2) the reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) lack of responsibility for the added costs." *Servidone Const. Corp. v. United States*, 931 F.2d 860, 861 (Fed. Cir. 1991). If Plaintiff's proof fails on any one of these elements, the Court can modify the test to adjust damages downward to account for the lack of proof on that element. *Youngdale & Sons Const. Co. v. United States*, 27 Fed. Cl. 516, 541 (1993) ("The modified total cost method is simply *the* total cost method *modified* or adjusted for any deficiencies in the plaintiff's proof in satisfying the four requirements of said method.") (emphasis in original). Plaintiff still bears the burden to prove damages for the adjusted amount. *Propellex Corp. v. Brownlee*, 342 F.3d 1335, 1339 (Fed. Cir. 2003) ("[U]nder its modified total cost method claim, [plaintiff] still had the burden of proving the four requirements for a total cost recovery set forth above. The modified method simply was a way of easing that burden somewhat."); *see also WRB Corp.*, 183 Ct. Cl. at 426 (the total cost "theory has never been favored by the court and has been tolerated only when no other mode was available *and when the reliability of the supporting evidence was fully substantiated.*") (emphasis added).

Even if Plaintiff had shown the United States was liable for damages under one of its differing site condition theories, which it has not, Plaintiff would have to clear additional hurdles to present its theory of damages as a modified total cost claim. Most substantially, Plaintiff cannot show entitlement to damages even by substituting its bid price for a reasonable one or that it is not responsible for the additional costs it incurred.

### i.  Reasonableness of Plaintiff's bid

A plaintiff seeking to recover on a modified total cost claim must demonstrate the reasonableness of its bid so as "not [to] get the benefit of its own failure to anticipate" the conditions it encountered. *Servidone Const. Corp. v. United States*, 19 Cl. Ct. 346, 384–85 (1990), *aff'd*, 931 F.2d 860 (Fed. Cir. 1991). The average bid is often the most appropriate method by which the Court can evaluate what a reasonable bid would have been. *Youngdale & Sons Const. Co.*, 27 Fed. Cl. at 543. At trial, the United States offered several examples of reasonable bid estimates, all much higher than OSI's subcontract bid. Using any of those

averages as a starting point for Plaintiff's modified total cost claim, Plaintiff's damages are a negative number. A negative number indicates that had Plaintiff bid a "reasonable" amount, it would have secured more than enough compensation to cover the costs it is now claiming. (Weathers, TR at 1126:15–23). Additionally, even substituting Phillips & Jordan's bid and assuming it was "reasonable" despite being lower than these averages, OSI cannot prove entitlement to damages.

OSI's subcontract bid for CLIN 0005 was unreasonable using any of the four comparative analyses provided at trial. First, OSI's subcontract bid price was higher than the average of the fourteen prime bids and the Independent Government Estimate. (*Id*. at 1067:14–1068:19). OSI's subcontract bid for excavation and embankment was $1.86 and $0.56, respectively. (*Id*.). The average bid price was $4.41 and $2.68, respectively. (*Id*.). OSI underbid the average prime bid by more than half on each line item, an unreasonably low price.

Second, compared to its own prime contract bid, OSI's subcontract bid was unreasonably low. OSI bid $2.50 for excavation and $1.57 for embankment work on the prime contract—increases of approximately 34% and 180%, respectively, from its subcontract bid. (*Id*. at 1068:20–1069:19). OSI offered that this discrepancy was due to the artificial inflation of its prime bid to take advantage of preferable price terms afforded because of OSI's Small Business Association classification. (Eastman, TR at 463:15–465:16). However, OSI's invocation of its 10% price advantage does not adequately explain the discrepancy. (Weathers, TR at 1164:15–1165:13). OSI failed to justify its massive reduction to its subcontract bid for the same scope work for which it had submitted a prime bid, and the Court finds the subcontract bid unreasonably low by comparison.

Third, the average of the two other subcontract bids for CLIN 0005 was $2.47 for excavation and $2.13 for embankment. (*Id*. at 1069:20–1071:20). OSI's subcontract bids for both those line items are approximately 25% and 74% lower, respectively—an unreasonable discount. (*Id*.). Fourth and finally, even including Phillips & Jordan's bid in the average of subcontractor bids, OSI bid for the subcontract at a steep discount—19.5% discount for excavation, and 72% discount for embankment. (*Id*. at 1071:21–1072:16). That discount is, again, unreasonable.

In fact, even had OSI performed the work at Phillips & Jordan's bid price—which is even lower than the averages mentioned previously and therefore a more conservative benchmark in OSI's favor—OSI cannot show any damages. (Weathers, TR at 1115:1–1126:23 (substituting Phillips & Jordan's bid price, OSI's damages would be *negative* $731,917)). In summary, OSI's subcontract bid was unreasonably low. And, even if the Court had found the United States liable and used a reasonable bid estimate most favorable to OSI, OSI could not establish damages under its modified total cost theory.

### ii.   Plaintiff's responsibility for additional costs

The fourth element a plaintiff must prove to recover on a modified total cost theory is its lack of responsibility for its added costs. *Youngdale & Sons Const. Co.*, 27 Fed. Cl. at 546. "Where both parties contribute to [added costs] neither can recover damage, unless there is in the proof a clear apportionment of the . . . expense attributable to each party." *Coath & Goss v. United States*, 101 Ct. Cl. 702, 714–15 (1944). The portion of damages attributable to the

government must be proven with such certainty that the Court can make a "reasonably correct approximation." *Wunderlich Contracting Co. v. United States*, 173 Ct. Cl. 180, 199 (1965). Here, Plaintiff cannot show with any reasonable certainty or approximation the portion of costs for which the Army Corps is responsible. Even if it could prove liability, Plaintiff would fail on this element of its modified total cost claim.

First, OSI failed to account for several significant expenses included in its cost claim; those costs were either by omitted from its bid price or were outside the scope of the claim. (Weathers, TR at 1093:18–1100:9). Those expenses include a global positioning system ($325,370.40), labor supervision costs ($161,355.61), equipment costs ($459,496.46), among others. (*Id.*). OSI acknowledged and later removed some of these erroneous costs from its claim, but other mistakes remained in the claim presented at trial. (Eastman, TR at 431:18-454:9 ($14,819.52 for water trucks; $58,346.45 for a tractor, etc.)). In all, OSI's claim at trial still contained approximately $459,500 worth of identified errors before OSI's profit markups. (Weathers, TR at 1097:17–1101:16).

Second, and more significantly, OSI failed to account for its own responsibility in employing the strategy that substantially contributed to the costs of longer haul distances and out of sequence work. As previously discussed, OSI elected to excavate and set aside Type 1 soil for its exclusive use to cap the top three feet of the embankment. (Eastman, TR at 273:5– 274:6). It could have used Type 1 soil as fill, but OSI chose not to. (*See* PX014.438–439). As it depleted the Type 2 soil available for use as embankment fill, OSI continued to set aside Type 1 while excavating further and further distances from the embankment work-in-progress. (Eastman, TR at 274:14–275:8). OSI failed to segregate costs related to the compensation it was provided under Contract Modification P00022 from the additional costs it alleges to have incurred. Therefore, Plaintiff has failed to establish that it lacks responsibility for the additional costs.

Additionally, as a last resort, Plaintiff urges the Court to utilize the "jury verdict" method of awarding damages. (Pl.'s Post-Trial Brief at 40). The heavily disfavored "jury verdict" method requires "clear proof" of injury, and sufficient evidence to make a "fair and reasonable approximation" of damages. *WRB Corp.*, 183 Ct. Cl. at 425; *Ravens Grp., Inc. v. United States*, 112 Fed. Cl. 39 (2013) (the jury verdict method is disfavored, and acceptable "only when more exact methods are inapplicable."). Plaintiff has not demonstrated clear proof of injury, nor has it provided sufficient evidence of resultant damages. Even assuming the government's liability (which, again, is far from established), were the Court to attempt to account for the defects identified above, any damages figure the Court would assess would amount to little more than a wild guess. Guesswork and speculation are inappropriate bases for calculating a damages award. *Thompson v. Haynes*, 305 F.3d 1369, 1382 (Fed. Cir. 2002) (damages awards must be more than "merely speculative."). Indeed, it is unclear whether OSI even knows what amount of damages would compensate it for any alleged harms as evidenced by the numerous changes OSI has made to its claim before, during, and after trial, and the mathematical errors in its post-trial briefing. Plaintiff has not established entitlement to damages with any reasonable certainty and has not provided the Court with any basis to award damages that amounts to more than an arbitrary figure pulled from thin air.

In conclusion, Plaintiff cannot establish two crucial elements of a modified total cost claim. The four elements are conjunctive, and thus Plaintiff's failure would be fatal to its claim

even if it had established the United States' liability for damages. *Propellex Corp.*, 342 F.3d at 1339 ("[U]nder [a] modified total cost method claim, plaintiff still ha[s] the burden of proving the four requirements for a total cost recovery set forth above."). Likewise, Plaintiff's claim for damages under the "jury verdict" method is overly speculative at best. Therefore, even assuming for the sake of argument that the United States bears some responsibility, the Court could not award damages under the theories Plaintiff has advanced, and the United States would be entitled to judgment.

### IV.   Decision and Order of Judgment

For the reasons discussed, Plaintiff cannot establish a differing site condition with respect to soil content and has not established that Contract Modification P00022 provided incomplete relief for the differing site condition with respect to material imbalance. Additionally, even if Plaintiff had established liability with respect to either claim, Plaintiff has failed to sufficiently establish entitlement to a quantum of damages that is based on anything more than mere speculation. Therefore, the Court finds and concludes that the United States is entitled to judgment. The Clerk is **DIRECTED** to enter judgment for the United States pursuant to RCFC 58. Each party shall bear its own costs.

**IT IS SO ORDERED.**



s/      David A. Tapp
DAVID A. TAPP, Judge